RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE   3/3/06
         GB

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| TECHNICAL INDUSTRIES, INC. | * | CIVIL ACTION NO. 05-1249 |
| VERSUS | * | JUDGE RICHARD T. HAIK |
| JEFFERY S. BANKS | * | MAGISTRATE METHVIN |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**RULING**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court is the complaint for a Preliminary Injunction filed by Plaintiff Technical Industries, Inc., herein referred to as Technical, seeking to extend the terms of the Temporary Restraining Order (Doc. #4) issued on July 15, 2005. On July 15, 2005, Technical filed a Complaint against Jeffery S. Banks, herein referred to as Banks, seeking a temporary restraining order, preliminary injunction, permanent injunction, and declaratory judgment. Technical seeks to enforce certain provisions in the Stock Option Agreement and the Non Disclosure Agreement. Technical seeks to enjoin Banks from becoming employed by or independently contracting with any enterprise that competes with Technical in the pipe testing and inspection business in the Parishes of Lafayette, Iberia, Vermillion, St. Martin, St. Mary, Terrebone, and St. Bernard in Louisiana and the Counties of Harris, Galveston, Fort Bend, Brazoria, and Montgomery in Texas. Technical also seeks an order restraining Banks from disclosing or using confidential information and trade secrets of Technical, particularly that concerning Technical's Visonic™ Pipe Inspection System. Upon due consideration of the parties' pleadings, memoranda, all testimony at the hearing on the preliminary

-1-

injunction, and a thorough review of the record, the Court makes the following ruling:

## I. Background

This dispute arises from Technical's employment of Defendant Jeffery S. Banks. Technical is engaged in the business of inspecting oilfield pipes and equipment for its customers. An important aspect of Technical's business is the ultrasonic testing of oilfield pipe. The purpose of ultrasonic testing is to find flaws or cracks in the steel and measure the wall thickness of the pipe. The data collected from ultrasonic testing is used to determine whether existing grades of pipe may be used in deeper oil wells. If so, oil may be reached from deeper reserves without extra cost.

Banks has worked in the arena of oil field pipe inspection since the 1980s. During that time, Banks designed modifications to pipe inspection machines. Technical, in pursuit of its pipe inspection system, employed Banks in August 2002. While employed by Technical, Banks developed a technique by which the data collected during pipe inspection is processed and depicted in a three-dimensional format. Technical identified this process as Visonic™. Technical claims that it has expended large amounts of resources in pursuit of Visonic™. On October 21, 2002, the Defendant signed a "Technical Industries, Inc., Standard Proprietary Non Disclosure Agreement" ("Non Disclosure Agreement") (Exhibit P-1). In the Non Disclosure Agreement, certain "confidential information" is identified, and the Defendant agreed to keep such information confidential subject to several exceptions in Section 7. The Non Disclosure agreement provides:

> "... The confidential information disclosed under this Agreement is described as: Full Body Ultrasonic Pipe Inspection unit also know[n] as Technical Industries Inc., proprietary ET Series Unit, including Pipe Inspection DATA Collection, 3D virtual imaging of the pipe and other inspection apparatus, and or methods used in collecting and or displaying the DATA, Defects Identifier circuitries known as ET-26 and ET-27, are two digital electronic boards designed to interact with the KSE's connected to Technical Industries Inc., transducers, located in the transducer shoe holder, installed in the inspection head assembly. VISONIC® is Technical Industries, Inc. proprietary trade mark.
>
> \*\*\*
>
> A party receiving confidential information under this Agreement ('Recipient') shall use the confidential information only for the purpose of: Research & Development, Repairs, redesign, reproduce for Technical Industries, Inc., and authorized associates.

> \*\*\*
> The intellectual property rights under this Agreement belong to Technical Industries, Inc.
> \*\*\*
> The recipient has no right under this Agreement to commercially offer any products or services using or incorporating the confidential information.
> \*\*\*
> Recipient acknowledges and agrees that the confidential information is provided in order to work on Technical Industries, Inc., products, and equipment in the best interest of Technical Industries, Inc., and all developments and improvements while working on the product, and the result of such work is the property of Technical Industries, Inc., until the last day requested by Technical Industries Inc., to work on the product.

Section 7 of the Non Disclosure Agreement imposes no obligation on Mr. Banks for "confidential information" which "(a) was in the Recipient's possession before receipt from the Disclosure; (b) is or becomes a matter of public knowledge through no fault of the Recipient..."

On December 4, 2003, Banks signed a Stock Option Agreement (Exhibit P-3). The Stock Option Agreement includes a noncompetition agreement, nonsolicitation agreement, and nondisclosure agreement. In the Stock Option Agreement, Banks acknowledged that he received and would continue to receive "special confidential information and trade secrets" of Technical, which were "obtained and developed by [Technical] at great expense, and [are] zealously guarded by [Technical] from unauthorized disclosure," and that Banks' possession of this special knowledge is due solely to his employment with [Technical]." Under the terms of the Stock Option Agreement, the confidential information of Technical includes:

> "... products; production methods; product development; records; data; specifications; research specification; inventions; know how; processes; customer identities and information; marketing and sales techniques and strategies; financial information; competetive strategies; as well as other information not disclosed to the general public or known in the industry and acquired or learned by Optionee during the course or on account of his employment with Optionor..."

Furthermore, Banks promised that he would not during or after his employment "disclose, disseminate, publish, use or make otherwise available" any Confidential Information of Technical;

that for a limited term (two years maximum) in a limited geographical area, he would refrain from taking employment or contracting with any business that competes with Technical in pipe testing inspection, or any customer of Technical, and would not solicit any customer of Technical for a competitor thereof for a limited time.

## II. Discussion

### A. Standard for a Preliminary Injunction

A preliminary injunction is an extraordinary remedy that may only be granted if the plaintiff establishes four elements: (1) a substantial likelihood for success on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause defendants (balancing the harms); and (4) that the injunction will not disserve public interest. *Sugar Busters, L.L.C. v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999); *Sunbeam Products, Inc. v. West Bend Company*, 123 F.3d 246, 250 (5th Cir. 1997). If the moving party fails clearly to carry its burden with respect to any one of these four criteria, then the preliminary injunction must be denied. *Black Fire Fighters Association v. City of Dallas, Texas*, 905 F.2d 63, 65 (5th Cir. 1990.) As discussed below, Technical has met its burden on all four factors, and therefore, is entitled to a preliminary injunction.

### B. Choice of Law

The Non Disclosure Agreement and the Stock Option Agreement include provisions adopting Louisiana law. "Louisiana allows parties to stipulate in their contracts which state's laws are to govern them." *NCH Corporation v. Broyles*, 749 F.2d 247, 250 (5th Cir. 1985), citing *White v. Crook*, 426 So.2d 334 (La. App. 2 Cir. 1983). *See Delhomme Industries, Inc. v. Houston Beechcraft, Inc.*, 669 F.2d 1049 (5th Cir. 1982). However, if there are legal or strong public policy considerations justifying the refusal to honor the contract as written, then the contractual stipulations are disregarded. *NCH Corporation* 749 F.2d at 250, citing *ADR v. Graves*, 374 So.2d 699, 700-01 (La. App. 1 Cir. 1979). *See Davis v. Humble Oil and Refining Co.*, 283 So.2d 783, 794 (La. App.

1 Cir. 1973). This policy is embodied in La. R.S. 23:921 which provides in pertinent part:

> A. (1) Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
>
> (2) The provisions of every employment contract or agreement, or provisions thereof, by which **any foreign or domestic employer** or any other person or entity includes a choice of forum clause or **choice of law clause** in an employee's contract of employment or collective bargaining agreement, or attempts to enforce either a choice of forum clause or choice of law clause in any civil or administrative action involving an employee, **shall be null and void except where** the choice of forum clause or choice of law clause is expressly, knowingly, and voluntarily agreed to and **ratified by the employee after the occurrence of the incident which is the subject of the civil or administrative action.** (emphasis added)

\*\*\*

In this case, Banks has not ratified the choice of Louisiana law. Accordingly, the choice of law clause in the contracts is null and void under Louisiana law. Given the parties' contacts with both Texas and Louisiana, the court is left with the basic question of whether to apply Texas or Louisiana substantive law to the issue of whether Technical is entitled to a preliminary injunction enforcing the restrictive covenants against Banks.

In determining which state's law applies in a diversity case, a federal district court applies conflicts of law principle of the forum state, here, Louisiana. *NCH Corporation* 749 F.2d at 250, citing *Klaxon Co. v. Stenor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Louisiana's choice-of-law rules, "Louisiana Civil Code Article 3540, entitled 'Party autonomy,' generally gives contracting parties the freedom to choose which state's law will govern disputes arising out of the contract." *Cherokee Pump & Equipment Inc. v. Aurora Pump*, 38 F.3d 246, 250 (5th Cir. 1994). "All other issues of conventional obligations [besides capacity and form] are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under

Article 3537." La. Civ. Code Art. 3540. Louisiana Civil Code Article 3537 sets forth the general rule concerning conventional obligations, which states:

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other. La. Civ Code Art. 3537.

"Louisiana Civil Code Article 3515, in turn, contains the general and residual choice-of-law rule pertinent to all types of cases, not just those involving conventional obligations." *Cherokee Pump & Equipment Inc.*, 38 F.3d at 250. Louisiana Civil Code Article 3515 provides that:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

By considering the factors listed both in Article 3537 and in Article 3515, Louisiana law, clearly, is the state's law that "would otherwise be applicable" even though the contractual choice of Louisiana law is null. Both Louisiana and Texas have an interest in the dispute, but Louisiana's interest in having its law applied *in the absence of a choice-of-law provision by the parties* would be stronger

than that of Texas. Here, Technical, a Louisiana corporation with its principal place of business in Lafayette, Louisiana, employed Banks, a citizen of Texas. Banks signed the Non-Disclosure Agreement and the Stock Option Agreement in Texas. In return for the option to purchase certain shares of Technical's stock, Banks agreed not to compete with Technical in several parishes in Louisiana and several counties in Texas, agreed not to solicit Technical's customers, and agreed not to disclose Technical's confidential information. After Banks signed the Stock Option Agreement, Technical signed the agreement in Louisiana. Banks managed employees located in Lafayette, Louisiana. Banks signed the agreements which contained the Louisiana choice-of-law provision. Also, this court found that Banks has sufficient contacts with Louisiana, enough to subject him to personal jurisdiction in this matter. Therefore it was forseeable certainly for Banks to expect that Louisiana law may apply to disputes arising out of these agreements.

"Louisiana's strong public policy restricting noncompetition agreements between employers and employees is based upon an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden." *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 2000-1695, p. 5, (La. 6/29/01), 808 So.2d 294. "Because such covenants are in derogation of the common right, they must be strictly construed against the party seeking their enforcement." *Id.*, citing *Hirsh v. Miller*, 249 La. 489, 187 So.2d 709, 714 (1966); *Turner Professional Services, Ltd. v. Broussard*, 99-2838, p.3 (La. App. 1 Cir. 5/12/00), 762 So2d. 184, 185. "Non-compete agreements are deemed to be against public policy, except to the limited circumstances delineated by statute." *Aon Risk Services of Louisiana, Inc. v. Ryan*, 2001-0614, p.4, (La. App. 4 Cir. 1/23/02), 807 So.2d 1058, 1061, citing *Lafourche Speech & Language Services, Inc. v. Juckett*, 94-1809, (La. App. 1 Cir. 3/9/95), 652 So.2d 679; writ denied 95-0850 (La.

5/12/95), 654 So.2d 351. Thus Louisiana has a strong interest in regulating these restrictive covenants in order to protect commerce in Louisiana and to police Louisiana corporations who engage in such transactions. The competing interests that Texas has in protecting Banks is that Banks is one of its citizens, he performed most of his work for Technical while physically located in Texas (although he directed Technical employees located in Louisiana), and the non-compete provision includes several counties in Texas. However, as stated above, Banks is clearly subject to suit in this Louisiana court which may justifiably apply the forum law to the issues in dispute. Accordingly, Louisiana law applies to the contractual issues and the non-contractual issues in this case.

C. *Law Applicable to Trade Secrets*

In this case the Court will initially decide whether Technical has a substantial likelihood for success under the Louisiana Uniform Trade Secrets Act. The Louisiana Uniform Trade Secrets Act, herein after "the Act," sets forth not only a right to recover damages, but also a right to injunctive relief for any actual or threatened misappropriation of a person's trade secret. *See* La. R.S. 51:1432-1433. Under the Act, a trade secret is, "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." La. R.S. 51:1431(4)(a)-(b). "The first question in any trade secrets misappropriation case is whether the plaintiff actually had a legally protectable trade secret; second is whether an express or implied contractual or

confidential relationship existed between the parties which obliged the party receiving secret information not to disclose it; lastly, the plaintiff must prove that the party receiving secret information wrongfully breached its duty of trust or confidence by disclosing or using information to the plaintiff's injury." *Pontchartrain Medical Labs, Inc. v. Roche Biomedical Laboratories, Inc.*, 677 So.2d 1086, 1995-2260 (La. App. 1 Cir. 6/28/96), *citing Engineered Mechanical Servs. v. Langlois*, 464 So.2d 329, 333 (La. App. 1 Cir. 1984), *writ denied*, 467 So.2d 531 (La. 1985); La. R.S. 51:1431(2)(b)(ii)(bb). The Court now turns to the first question, whether Technical has a protectable trade secret under the meaning of the Act.

The Louisiana Third Circuit Court of Appeal, in *W.C. Lamb v. Quality Inspection Services, Inc.*, 398 So.2d 643, 214 U.S.P.Q. 575 (La. App. 3 Cir. 1981), was faced with similar issues regarding whether the plaintiff had a legally protectable trade secret. In affirming the district court's decision not to issue a preliminary injunction, the court held that the plaintiff failed to make a prima facie showing of the existence of its alleged "trade secret." *Id.* at 647, 648. In *W.C. Lamb*, the plaintiff was a business primarily engaged in pipe inspection for the oil industry. *Id.* at 644. The defendants were former employees of the plaintiff who terminated their employment and formed a new company shortly thereafter. *Id.* at 644-45. The defendant's new company was engaged in inspecting pipe and tools for the oil industry which are used for the "bottom hole assembly." *Id.* at 645. The main process the defendant's new company used to conduct inspections was through ultrasonic testing. *Id.* The plaintiff claimed that "it developed certain techniques and procedures for conducting an ultrasonic inspection of tubular goods, including those used in making up a 'bottom hole assembly', after expending large sums for research and development." *Id.* at 646. "The plaintiff also claimed that it gained a competitive edge through the use of this information, which

it sought to keep confidential and, therefore, the information was a 'trade secret.'" *Id.* The plaintiff contended that its development and compilation of information regarding the ultrasonic testing of component parts of a "bottom hole assembly" was a trade secret and that the defendants' use of such information constituted a violation of its property rights. *Id.* The defendants argued that the techniques and procedures used by the plaintiff were matters of public knowledge which were developed by others long before the plaintiff applied them in certain specific situations and that such information was not a trade secret. *Id.*

The court found that there were many other companies which used the ultrasonic inspection method for tubular products including component parts of the "bottom hole assembly." *Id.* The plaintiff argued that it was the only company that used its certain techniques and procedures to make the inspections. *Id.* However, the court found that there was no evidence to support such a conclusion and that the plaintiff simply refined techniques and procedures generally known by those familiar with the ultrasonic inspection method. *Id.* Although this case was decided before the Louisiana legislature passed the Act, this case does offer guidance under the law applicable to trade secrets.

In the present case, Technical claims that its method, technique, and procedure used to inspect pipe, and particularly Visonic™, are "trade secrets" under Louisiana law. Unlike *W.C. Lamb*, the record in this case indicates that Technical did in fact develop something new and not generally known or readily ascertainable when it developed Visonic™. According to the testimony of Banks at the hearing on the preliminary injunction, only Technical, to his actual knowledge, was successful in the inspection of pipe using ultrasonic technology going all around a piece of pipe, storing every thickness data reading, the location of each thickness data reading in all three space coordinates, and

a combination of ovality which attempts to better determine the exact location of the thickness data reading. The record also indicates that only Technical has been successful in presenting this data in its Visonic™ format. Banks' testimony also indicates that competitors of Technical have not combined all of these techniques in inspecting pipe, taking these exact measurements, storing the data, and presenting the data in this format. Thus Technical's new capability in inspecting oil field pipe has independent economic value from not being generally known. La. R.S. 51:1431(4)(a)-(b).

Technical was acclaimed in a *World Oil Magazine* article for its new technology and the value it brought to British Petroleum. It is also clear from the record that Technical took reasonable measures to maintain a veil of secrecy around its new technology. Technical took these reasonable measures by requiring its employees, including Banks, to sign the non-disclosure agreement. "[T]he Act does not require absolute secrecy." *Trade-Secret Misappropriation Under the Louisiana Trade Secrets Act, Miester, Jr., Donald J.*, 44 La. B.J. 326, 328 (December 1996). "Instead the Act specifies that [r]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a need to know basis, and controlling plant access." *Id.* See *Sheets v. Yamaha Motors Corp.*, 849 F.2d 179, 183 (5th Cir. 1988), quoting *Tubular Threading, Inc. v. Scandaliato*, 443 So.2d 712, 714 (La. App 5 Cir. 1983). Accordingly, the Court finds that Technical's information relating to the development of Visonic™ and the Visonic™ inspection system itself is a trade secret under Louisiana law.

The next question, in this case, is whether Banks should be enjoined from disclosing, using, or divulging Technical's trade secrets. Under the Act, only misappropriations of trade secrets or threatened misappropriations of trade secrets may be enjoined. *See* La. R.S. 51:1432-1433. Therefore the Court must address whether Banks has engaged in a misappropriation or threatened

misappropriation.

Under Louisiana law, a misappropriation of a trade secret may occur by the following. First, misappropriation is defined under La. R.S. 51:1431(2) as the:

> (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;or

Second, misappropriation of a trade secret may occur by the:

> (b) disclosure or use of a trade secret of another without express or implied consent by a person who:
>> (i) used improper means to acquire knowledge of the trade secret; or
>> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>>> (aa) derived from or through a person who had utilized improper means to acquire it;
>>> (bb) acquired under the circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>> (cc) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. *See* La. R.S. 51:1431.

Improper means is defined as "theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. La. R.S. 51:1431(1).

In the present case, Banks has an obligation not to disclose any trade secrets, proprietary, or confidential information under the Stock Option Agreement and Non Disclosure agreement. According to Banks' testimony, he seeks to use a different computer code to come up with the same pipe inspection data. This new method of inspecting pipe is not the industry standard and is a trade secret under Louisiana law. Regardless of whether Banks seeks to use a different computer code, he

seeks to combine the same data collection method as Technical developed and embodied in Visonic™. As previously discussed, the record indicates that this pipe inspection process has not before been successfully completed by any other company. To find otherwise would allow a new company to profit from another's intellectual property and thereby obtain an unjust economic advantage. *Stork-Werkspoor Diesel V.V. v. Koek*, 534 So.2d 983, 985 (La. App 5 Cir. 1988). Accordingly, Banks has engaged in a threatened misappropriation of Technical's trade secret. Therefore, Technical has a substantial likelihood for success under the Louisiana Uniform Trade Secrets Act.

Second, this court must determine whether there is a substantial threat that Technical will suffer an irreparable injury if the preliminary injunction is denied. *See Sugar Busters, L.L.C.*, 177 F3d at 265. Technical's potential injury is irreparable if Banks' ability to disclose Technical's trade secret information to competitors, customers, or any other person were not enjoined. As discussed above, Technical developed this new pipe inspection process through a large investment of company resources. In addition, Technical "zealously guarded" its confidential and trade secret information throughout its development of this new pipe inspection technique. If another person obtained the method by which Technical's new technique was developed, because Banks disclosed the information, then that person would obtain this information without expending the time, effort, and cost that Technical endured in pursuit of this new process. The risk that Technical's competitors may gain knowledge of Technical's new pipe inspection technique is only heightened if this court would not enjoin Banks' disclosure of Technical's trade secret information.

Third, this court must determine whether the threatened injury outweighs any damage that the injunction might cause Banks. *Id.* The purported damage which Banks may suffer is the loss

of the ability to disclose Technical's trade secret information. Banks still has a wealth of knowledge and experience in the oil field pipe inspection industry. After all, he has worked in the industry for over twenty years. His skills which he developed throughout his career should certainly make him an asset to another company. However, one thing he may not bring to another company is Technical's legally protected trade secrets. Banks has no right to such information. Accordingly, Technical's threatened injury (loss of its trade secrets) outweighs any damage Banks may suffer.

Fourth, this court must find that the issuance of a preliminary injunction will not disserve the public interest. *Id.* The Act "attempts to balance the protections accorded to proprietary ideas against the need for healthy commercial competition; its fundamental goal is to prevent a company from wrongfully profiting from another's intellectual property and thereby obtaining an unjust economic advantage." *Trade-Secret Misappropriation Under the Louisiana Trade Secrets Act, Miester, Jr., Donald J.*, 44 La. B.J. 326, 329 (December 1996). *See also Stork-Werkspoor Diesel V.V. v. Koek*, 534 So.2d 983 (La. App 5 Cir. 1988). Here, public interest will be served by the issuance of the preliminary injunction because Banks will be enjoined from disclosing Technical's trade secrets. This will prevent another company from gaining an unjust advantage and serve to protect the fruits of Technical's investments.

D.   *Restrictive Covenants*

The court now turns to the question of whether, under Louisiana law, Technical is entitled to a preliminary injunction enforcing its rights in the Non Disclosure Agreement and the Stock Option Agreement thereby enjoining Banks from competing with Technical, soliciting Technical's customers, and disclosing Technical's confidential information. First, this court will determine

whether Technical has a substantial likelihood for success on the merits of its claim for enforcing Banks' obligations under the Stock Option Agreement. See *Sugar Busters, L.L.C.*, 177 F.3d at 265.

There is no dispute as to the enforceability of the Noncompetition, Nonsolicitation, and Nondisclosure provisions of the Stock Option Agreement under Louisiana law. Banks argues only that, under Louisiana law, the Noncompetition and Nonsolicitation provisions are overbroad in geographic boundary and scope. Under La. R.S. 23:921(C):

> Any person ... who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, **so long as the employer carries on a like business therein,** not to exceed a period of two years from termination of employment. (Emphasis added.)

Public policy requires that noncompetition agreements must be strictly construed in the employee's favor. See *SWAT 24 Shreveport Bossier, Inc., supra*. Therefore Technical should bear the burden of proof on the issue of geographic scope. Under the terms of the Stock Option Agreement, Technical's business is defined as, "pipe testing and inspection business." Therefore, Banks may be enjoined from competing with Technical only in those named parishes and counties where Technical carries on a "pipe testing and inspection business" or a "like business therein." La. R.S. 23:921(C). According to the record, Technical conducts pipe testing and inspection in Harris County, and operates its home office in Lafayette Parish. Technical is presently building a pipe inspection facility in Vermillion Parish. Banks was paid by check drawn on Technical's account at an Iberia parish bank. Banks made sales calls on customers of Technical in New Orleans. Based on this evidence, Technical carries on a pipe testing and inspection business, or a like business, in Harris County, Lafayette Parish, and Vermillion Parish. Thus the parishes of Iberia, St. Martin, St.

Mary, Terrebone, and St. Bernard in Louisiana are overbroad; and the counties of Galveston, Fort Bend, Brazoria, and Montgomery are overbroad in Texas.

Nonsolicitation agreements are also governed by the geographic scope limitations under La. R.S. 23:921(C). Under the terms of the Stock Option Agreement, Banks agreed not to become employed by or contract with any customer of Technical with whom Banks has had any professional contact within one year from the date of termination of employment, also within the geographic area defined. Furthermore, Banks agreed not to solicit any customer of Technical with whom Banks has had any professional contact within one year from the date of termination of employment on behalf of any enterprise that competes with Technical in the pipe testing and inspection business. Therefore, under Louisiana law, Technical has a substantial likelihood for success of enforcing the nonsolicitation agreements against Banks in Harris County, Lafayette Parish, and Vermillion Parish.

Second, the court must determine whether Techncial has a substantial likelihood for success of enforcing the nondisclosure obligations against Banks. See *Sugar Busters, L.L.C.*, 177 F.3d at 265. Under the terms of the Non Disclosure Agreement and the Stock Option Agreement, certain elements withing the definition of Technical's "confidential information" constitute technology known and existing in the industry before Banks' employment with Technical. Therefore Technical has a substantial likelihood for success on the merits of enforcing the nondisclosure agreements contained in those contracts, but only for the following information: Non Disclosure Agreement: (i) Full Body Ultrasonic Pipe Inspection unit also known as Technical Industries Inc. proprietary ET Series Unit (ii) Pipe Inspection Data Collection *method as Technical developed and embodied in Visonic™ the trade secret data collection method going all around a piece of pipe, storing every thickness data reading, the location of each thickness data reading in all three space coordinates,*

*and a combination of ovality which attempts to better determine the exact location of the thickness data reading*, (iii) 3D virtual imaging of the pipe and other inspection apparatus, (iv) Defects Identifier circuitries known as ET-26 and ET-27. Stock Option Agreement: (i) products; production methods; product development; records; data; specifications; research specification; inventions; know how; processes; customer identities and information; business policies; business methods and techniques; research; marketing and sales techniques and strategies; financial information; competitive strategies; as well as other information not disclosed to the general public or known in the industry and acquired or learned by Banks during the course or on account of his employment with Technical.

Third, under La. R.S. 23:921(H), "upon proof of the obligor's failure to perform, and without the necessity of proving irreparable injury, a court of competent jurisdiction shall order injunctive relief enforcing the terms of the agreement." Therefore, irreparable injury is not a required element for the issuance of a preliminary injunction for the enforcement of the noncompetition, nondisclosure, and nonsolicitation agreements.

Fourth, this court must determine whether the threatened injury outweighs any damage that the injunction might cause Banks. *See Sugar Busters, L.L.C.*, 177 F.3d at 265. The damage that Banks may sustain if these restrictive covenants were enforced is: (i) Banks would be prohibited from competing with Technical and soliciting Technical's customers for two or one year(s), respectively, from the date he terminated his employment with Technical, while within a defined number of parishes in Louisiana and counties in Texas; (ii) Banks would be prohibited from divulging Technical's confidential information. On the other hand, the threatened injury Technical may sustain if Banks were not enjoined is: (i) the potential loss of its fiercely guarded confidential

information into the hands of its competitors, (ii) the loss of its ability to prevent Banks from enabling Technical's competitors or customers to gain a competitive advantage through hiring, employing, or contracting with Banks. Here, Technical's rights are sufficiently protected and the potential damage to Banks is sufficiently mitigated by the court's decision to limit the geographic scope of the restrictive covenants and the definition of "confidential information" as set forth above. Therefore, Technical has met its burden with respect to the "balancing of the harms" element.

Fifth, this court must find that the issuance of a preliminary injunction will not disserve the public interest. *Id.* Although there is a strong public policy in Louisiana restricting these noncompetition and nonsolicitation agreements, these contracts are clearly permitted in the limited circumstances delineated by La. R.S. 23:921. *LaFourche Speech & Language Services, Inc. v. Juckett*, 94-1809 (La.App. 1 Cir. 3/3/95), 652 So.2d 679; writ denied by, 95-0850 (La. 5/12/95), 654 So.2d 351. Here, the contracts have met the statutory requirements under Louisiana law. Where they were devoid of compliance the court has remedied the problem by limiting the geographic scope of the agreements and definition of what is confidential information. Certainly, therefore, the agreements' enforceability is not against public policy.

Accordingly, it is HEREBY ORDERED that a preliminary injunction shall issue extending the terms of the temporary restraining order, but within the following limitations: It is HEREBY ORDERED that Banks is and shall be enjoined from becoming employed by or independently contracting with any enterprise that competes with Technical Industries in the pipe testing and inspection business in the parishes of Lafayette and Vermillion in Louisiana, and Harris County, Texas. It is HEREBY ORDERED that Banks is and shall be enjoined from soliciting the customers

of Technical Industries in the parishes of Lafayette and Vermillion in Louisiana, and Harris County, Texas. Furthermore, it is HEREBY ORDERED that Banks is and shall be enjoined from disclosing Technical Industries' confidential information and trade secrets, to wit: Non Disclosure Agreement: (i) Full Body Ultrasonic Pipe Inspection unit also known as Technical Industries Inc. proprietary ET Series Unit (ii) Pipe Inspection Data Collection *method as Technical developed and embodied in Visonic™ the trade secret data collection method going all around a piece of pipe, storing every thickness data reading, the location of each thickness data reading in all three space coordinates, and a combination of ovality which attempts to better determine the exact location of the thickness data reading*, (iii) 3D virtual imaging of the pipe and other inspection apparatus, (iv) Defects Identifier circuitries known as ET-26 and ET-27. Stock Option Agreement: (i) products; production methods; product development; records; data; specifications; research specification; inventions; know how; processes; customer identities and information; business policies; business methods and techniques; research; marketing and sales techniques and strategies; financial information; competitive strategies; as well as other information not disclosed to the general public or known in the industry and acquired or learned by Banks during the course or on account of his employment with Technical.

THUS DONE AND SIGNED at Lafayette, Louisiana, this 2nd day of March 2006.

CHIEF JUDGE RICHARD T. HAIK, SR.
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA